RAYMOND M. GUNNISON, THE DIRIGO CORPORATION, R. D. WAL-BRIDGE COMPANY, INC., ARTHUR R. McCABE and FREDERICK FRADLEY and WALTER C. DOUGLAS and NORMAN E. TITUS, trading under the firm name and style of McCabe & Fradley, CURTIS P. FIELDS, WILLIAM B. ORR, ARTHUR F. SPAULDING, FRANK S. SHAW, IRVING M. DAY, WILLIAM CURRIE, CHARLES H. SPRAGUE and KARL B. SMITH,

*vs.*

WOODWARD IRON COMPANY, a corporation existing under the laws of the State of Delaware, ALAN H. WOODWARD, F. H. CROC-KARD, D. E. WILSON, HERBERT E. SMITH, H. E. VANCE, D. A. BURT, L. W. FRANZHEIM, P. R. PYNE, S. W. WEBB, FREDERICK AYER, ROBERT JEMISON, SR., E. J. SMYER, OSCAR WELLS and W. M. VANCE.

*New Castle, Feb.* 26, 1927.

*William S. Hilles*, for complainants.

*Robert H. Richards* and *Charles C. Keedy*, for defendants.

THE CHANCELLOR. The original bill in this cause is a lengthy one. Its allegations hinge principally upon a complaint that the corporation, through the domination by the so-called "Woodward Interests" and "Vance Interests" of the board of directors whose members are made defendants, has purchased some twenty-five thousand shares of the common stock of the company from one stockholder, at a price in excess of its worth and far in excess of its fair value on the market. It is charged in the original bill that the company had no available cash with which to make the purchase, that in order to effect the purchase it borrowed $3,224,933.83 from the First National Bank of Birmingham, Alabama, and pledged

as security therefor all or a large part of $4,500,000 in par value of its first mortgage bonds held in its treasury. As a result of this purchase of stock, the bill charges that the Woodward and Vance interests have increased the voting strength of themselves in the corporation from about fifty per cent. to well over a majority, in fact to about a two-thirds. The original bill further charges that the company never offered to stockholders generally to purchase ratably from them any stock which it desired to acquire. Having acquired the stock referred to, the bill then alleges that the company through action of its stockholders and directors took steps to reduce the outstanding capital by the process of cancelling the twenty-five thousand odd shares purchased as aforesaid together with some two thousand more shares of common stock previously acquired by the company. The proposed reduction in capital is charged to be unlawful in that the shares were acquired at a price above the par value thereof and that, aside from the statutory inhibition applicable thereto, such reduction of capital is contrary to equity and good conscience and injurious to the stockholders. The suit is a derivative one asserted in the right of the corporation by the complaining stockholders in behalf of themselves and all other stockholders who may care to join therein. The defendants are the company and its directors.

The prayers, in addition to the usual ones, are that the purchase of the 25,951 shares of common stock be decreed to be *ultra vires* and void; that the Chancellor decree the proposed reduction of capital to be unlawful, and that all corporate proceedings to that end be enjoined; that an injunction issue against paying any money or issuing any bonds or notes to the First National Bank of Birmingham, Alabama, on account of principal or interest on the notes of the corporation held by it as aforesaid; that the individual defendants, directors of the corporation, be decreed to pay to it the difference between the value of the purchased shares and the price paid therefor, or that they be decreed to pay to the company $3,224,933.83 together with interest, the purchase price of the stock, upon assignment to them by the company of the stock purchased; and that, in event the individual defendants shall not appear in the cause, a receiver be appointed for the purpose of proceeding against them in jurisdictions where they may be sued

for the purpose of obtaining relief against them because of their alleged mismanagement.

The appearing defendant, the company, answered the bill denying all of its material hostile allegations. In its answer facts were averred which amplified certain admitted allegations of the bill, explained others and supplemented others.

Thereupon the complainants amended their bill. By their first amendment, which is to paragraph three of the original bill, they allege an overissue of stock of the corporation discovered, as they say, after the bill was filed when they were for the first time permitted to inspect the duplicate stock ledger. They pray a full discovery as to the true state of facts with respect to the quantity of issued stock. In this amendment they further charge that the circumstance of the purchase of stock was not, as the answer shows, disclosed on the company's balance sheet and was thus concealed by the company, the complainants having no knowledge thereof until so advised by the answer. The original bill, however, alleges the fact of purchase.

By their second amendment, the complainants repeat all of their old paragraph twelve and add thereto an allegation that the purchase of the stock at the price named was not made or intended to be made by the directors for the best interests of the corporation and its stockholders, but was on the contrary, as the amendment charges, purchased for some reason unknown to the complainants in no way connected with the best interests of the corporation. The amendment prays full discovery of the purpose intended to be served by such purchase.

By their third amendment the original paragraph fourteen is repeated, with the sole added allegation that the information as to the affairs of the company which the original paragraph charged the directors with intentionally failing and neglecting to impart to the minority stockholders, is now said to have been intentionally concealed from them.

By their fourth amendment a new paragraph numbered 21-A is added to the bill. This new paragraph is based on information which the complainants say they first acquired from the answer. It is to the effect that the company proposes to borrow sufficient funds "through the issue of its first mortgage bonds" in order to

pay off the loan obtained from the Birmingham bank; that the said bonds under the terms of the indenture authorizing them cannot be lawfully certified and used for any such purpose; that the complainants do not know and pray to be informed how the bonds stated by the answer to be in the treasury lawfully came to be there; that the company proposes to issue the bonds at less than their face value and thereby indirectly pay for the purchase of the said stock an amount in excess even of the sum before charged to have been excessively paid therefor.

Another new paragraph called 21-B is also added to the bill. This paragraph makes allegations and prays discovery as to the following, learned since the filing of the bill: The company had certified to the trustee and has used, sold or has in its treasury $2,400,000 of its first mortgage bonds, upon the representation that said bonds were to be used to retire $2,000,000 of bonds of one of its predecessors in title, notwithstanding a sinking fund was provided to take care of said predecessor's bonds which if operative would have largely retired the same by now. Full discovery is asked concerning this phase of the company's operation.

Another amendment is made to the bill, known as paragraph 21-C. This amendment charges that the company's first mortgage bonds cannot be lawfully used under the provisions of the indenture securing them for the purpose of making expenditures, which injuriously affect the rights of holders of other bonds of the authorized issue and directly affect the common stockholders, in the acquisition or securing the purchase price of shares of the common stock; nor can it employ stock so acquired for the purpose of reducing its capital.

By the amendments additional prayers are added. They are as follows:

That, by a decree, the company be directed to sell and dispose of the stock purchased as above stated, and the directors decreed to pay the difference, if any, between the sum paid for the stock and the sums realized from its sale, and upon their failure to pay such difference that the company be decreed to institute suits against them.

That the company, its officers and directors be perpetually enjoined from using any of its first mortgage bonds to pay for, or

· to reimburse itself for, the purchase of said shares of common stock or any part thereof.

That the company be decreed to return to the trusteè under the indenture of mortgage securing said bonds all or such part of the total amount of bonds which may have been unlawfully certified contrary to the provisions of the indenture of mortgage securing them.

After the filing of these lengthy amendments, the appearing defendant moved for leave to withdraw its answer for the purpose of demurring to the entire bill as amended. The motion is opposed.

The purpose of a demurrer originally was to save the defendant from answering. Hence if he answered, having done that which it was the office of the demurrer to save him from doing, there was no reason in allowing him to demur. The position of a defendant who answered and demurred at the same time would be the inconsistent one of saying—I would like to demur in order to show why I should not file the answer which I have already chosen to make. Accordingly an answer and demurrer could not exist on the record at the same time. The former would overrule the latter. Where, however, the case made by the amendment was a different one from that made by the bill, even under the old practice, the defendant could obtain leave to demur notwithstanding he had filed an answer. *Cresy v. Bevan*, 16 *Sim.* 354; 1 *Daniel's Chancery Practice*, 409, 582, 583. And even though the situation was one where the amendment filed did not introduce a new case, yet in some jurisdictions, notably Tennessee, the court could, in the absence of statute or rule, in its discretion allow an answer to be withdrawn in order that the right to relief might be tested by a demurrer. *Lowe v. Morris*, 4 *Sneed* (*Tenn.*) 69; *Chestnutt v. Frazier*, 6 *Baxt.* (*Tenn.*) 217; *Merchant v. Preston*, 1 *Lea* (*Tenn.*) 280. This practice, in cases where it was sought to question either the jurisdiction of the court or the general equity of the bill, has much to commend it to favor, because it is apparent that the expedition as well as the economical conduct of causes might in many cases be advantageously served thereby. Our equity *Rule* 35, which provides that the filing of a demurrer or a plea does not relieve the defendant from answering the bill unless time for filing the answer be extended by order of the Chancellor, has in its spirit destroyed

the old conception that an answer and demurrer can no longer exist side by side. In so far therefore as the old practice of allowing an answer the effect of depriving the defendant of an opportunity to resort to a demurrer is founded on the old conception of an incompatability between the two, there is no reason, in view of our *Rule* 35, for longer adhering to the rather strict view that after answer the defendant is, except in very limited cases, foreclosed from recurring to a demurrer in order to test the sufficiency of the complainant's case.

Accordingly, I think the defendant should, if he has inadvisedly answered, be allowed in proper cases to go back and demur. But his right to do so must always be subject to control by the court in the exercise of its discretion. If it were not so, it is manifest that a defending litigant could harass his opponent with dilatory and vexatious tactics. In the law courts of this State I understand that a defendant may be allowed in the discretion of the court to withdraw his pleas and demur if it is clear that his purpose is the bona fide one of securing the judgment of the court upon the law of the case as presented by the declaration. I see no reason why a like rule should not prevail in equity.

Of course so long as the answer stands, a demurrer should not be filed, for its place in the order of pleading is properly anterior to that of an answer. Before it can be filed, therefore, the answer must upon leave be withdrawn. Otherwise the standing answer will overrule the demurrer. The defendant in the instant case, was accordingly right in first asking leave to withdraw the answer before seeking to demur.

It being thus held that an answer may in the discretion of the court be allowed to be withdrawn in order to demur, the question arises—Under what circumstances will the court allow the answer to be withdrawn? In answering that question, it would be hazardous to venture a too comprehensive statement. As a general principle I think it may be said that if the purpose of the defendant is not delay but the genuine one of testing the equity of the complainant's bill and his right to relief thereon, it is entirely reasonable to allow him to do so, for thereby the cause if it be a bad one may be brought to an early determination without the expense

and delay attendant upon a hearing on bill and answer. or upon the taking of testimony.

There are certain things, however, which a demurrer might reach if filed in time but which after answer filed should be regarded as waived. As to what things may be thus waived, I do not care to undertake to catalog. They must be passed upon as the course of litigation in the courts presents them. The present application supplies an example, it seems to me, of one type of defect which an answer waives, and which cannot after answer be objected to. I refer to the objection that the bill is multifarious. The defendant desires to withdraw his answer and demur *inter alia* on the ground that the bill as amended is multifarious. Now, in so far as the multifariousness consists of new matter introduced by the amendments, the defendant can of course demur thereto, because it has never yet answered those amendments. But in so far as the multifariousness consists of causes of action that appear in the original bill and which the answer has replied to, I think the defendant cannot now go back and object to their joinder. An answer waives all objection to multifariousness in a bill. 21 *C. J.* 424, 431. If the amendments do nothing more than amplify or supplement the allegations of the original bill, introducing no new cause of action, then no objection should be allowed to be raised because of multifariousness. But if the amendments go beyond this and introduce a separate and distinct cause of action which they join with the causes in the original bill, then the demurrer to the amendments as presenting multifarious matter would be in order without any special leave.

Now in the instant case, I take it that the defendant wishes, if leave be granted to withdraw the answer, to demur on the ground *inter alia*, that the original bill is multifarious in its joinder of causes of action. This cannot be allowed, because those causes of action have been answered. The defendant contends, however, that the amendments have made a new case and on the principle of *Cresy v. Bevan, supra*, it should be allowed to treat the entire amended bill as though no answer had ever been filed. I accept *Cresy v. Bevan* as an authority, but it has no bearing here, for in that case the amendment completely abandoned the case as made by the original bill and substituted an entirely new one, whereas

here the amendments have in no sense abandoned the case as made by the original bill. The most they can be argued to do, besides amplifying the original case, is possibly to present a new and additional ground of complaint. Though I do not decide that they even do this. All I mean to say is that such is the utmost that can be contended against them in this connection. The original cause or causes of action are left intact by the amendments. In this respect the case is entirely different from *Cresy v. Bevan*. I cannot see that the amendments transform the case made by the original bill into a new one. The circumstance that the amendments make some charge concerning concealment of matters, concealment which the original bill strongly hinted at, does not impress me as turning the original case into a new one.

In the light of the foregoing, what is the disposition that should be made of the present motion? In answering this question, I can speak only in a general way, as follows:

The defendant may, of course, demur to any of the amendments upon any ground its solicitors in their judgment deem advisable. The answer heretofore filed, it is conceded, cannot in any way interfere with this right. In so far as it is desired to attack the cause or causes of action contained in the original bill on the ground that there is no equity entitling the defendants to relief with respect thereto, I think the defendant should be afforded the opportunity to present its contention in that regard, being satisfied as I am that the purpose of the solicitors for the defendant is the *bona fide* one of advancing the cause to a speedy determination. In so far as alleged multifariousness appearing in the original bill is sought to be attacked, it is too late for the defendant to do so. The same is to be said as to any defect in matters of form, that may be thought to inhere in the original bill. I suggest that the solicitors for the defendant and the solicitor for the complainant confer together with the view of agreeing upon what particular grounds of demurrer may be urged in the light of what I have hereinbefore said.